# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2014

Lyle W. Cayce
Clerk

No. 13-10171

GE CAPITAL COMMERCIAL, INCORPORATED; GENERAL ELECTRIC CAPITAL CORPORATION; GE CAPITAL FINANCIAL, INCORPORATED,

Plaintiffs - Appellees

v.

WORTHINGTON NATIONAL BANK,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

GE Capital Commercial, Inc., General Electric Capital Corporation, and GE Capital Financial, Inc. (collectively "GE Plaintiffs"), sued Worthington National Bank ("Worthington") under the Texas Uniform Fraudulent Transfer Act ("TUFTA").  The GE Plaintiffs sought to void transfers that Worthington received from the GE Plaintiffs' predecessor-in-interest, allegedly with notice of the transfers' fraudulent nature.  The jury found in favor of the GE Plaintiffs, and the district court entered judgment for the amount of the transfers.  On appeal, Worthington contends that either TUFTA or the common-law one-satisfaction rule entitles it to a settlement credit for the GE Plaintiffs' prior settlement with a non-defendant, and that the district court erred in

## No. 13-10171

construing TUFTA's "good faith" defense as an objective, rather than subjective, standard in its jury instructions and evidentiary rulings. We affirm.

### I

In 2006, David Ashley Wright ("Wright") and Justin Prather ("Prather") applied for a line of credit from Worthington, on behalf of Wright's company Wright & Wright, Inc. ("Wright & Wright"). When applying, Wright and Prather represented to Worthington that the company brokered heavy equipment on a nationwide scale and enjoyed extraordinary revenue growth. Worthington failed to verify Wright & Wright's representations.[1] Nonetheless, the following year, the bank extended a line of credit to Wright & Wright in the amount of $2.5 million.

Months later, Worthington employees noticed suspicious activity involving Wright & Wright's accounts, including numerous wire transfers into Prather's personal account and cash withdrawals by Wright. After initially flagging Wright & Wright's accounts for risks of money laundering, Worthington employees later concluded that nothing was amiss after Wright explained that the company's investors preferred to be compensated in cash. Although the frequency of transfers subsequently increased, Worthington took minimal action.

By three wire transfers in July 2008, CitiCapital Commercial Corporation ("CitiCapital"), then a subsidiary of Citibank, N.A. ("Citibank"), wired a total of $2,471,330 to Wright & Wright's checking account at Worthington to pay off the balance of the loan. A month after receiving those transfers, Worthington closed Wright & Wright's accounts.

---

[1] Because the jury found in favor of the GE Plaintiffs, and because Worthington does not contest the jury's factual findings, we present the facts in the light most favorable to that verdict. *See Brown v. Sudduth*, 675 F.3d 472, 477 (5th Cir. 2012).

No. 13-10171

CitiCapital was then acquired from Citibank by various GE entities under a Purchase and Sale Agreement. The GE entities subsequently investigated the three wire transfers and concluded that Prather, then an employee of CitiCapital, had fraudulently appropriated funds from CitiCapital to repay Wright & Wright's loan. In total, Prather ultimately induced his employers CitiCapital and, later, GE Capital to transfer $12.5 million to various bank accounts, including the $2.5 million transferred to Worthington.

In April 2009, the GE Plaintiffs sent a Notice of Claim and Demand to Citibank. The Notice sought three remedies under the Purchase and Sale Agreement—a purchase price adjustment, indemnification for breaches of the Purchase and Sale Agreement, and indemnification from later claims by other parties. In explaining the purchase price adjustment, the Notice contended that "[b]ased on GE's review to date, the damage and lost value caused by the Fraud Scheme to the Business and Portfolio Assets was no less than $12,500,000." In summarizing the amount of the claim, the Notice explained: "GE currently estimates that it has suffered and incurred losses in the amount of at least $12,500,000 in respect of the Employee Fraud Scheme and the Fraudulent Documents, as well as substantial costs and fees to investigate the Employee Fraud Scheme, assess and modify business processes and systems, mitigate damages and recover losses."

In June 2009, the GE Plaintiffs named Worthington as a defendant in a lawsuit that they had initiated in the district court as successors-in-interest to CitiCapital. The GE Plaintiffs alleged that the bank had accepted the wire transfers "in bad faith or with willful ignorance as to the fraudulent nature of the fraudulent conduct," in violation of TUFTA, and sought to void the transfers and recover the funds. Second Amended Complaint at ¶ 43. In response, Worthington pleaded numerous affirmative defenses, including that

3

it had accepted the transfers in good faith under TUFTA. Tex. Bus. & Comm. Code § 24.009(a); Answer at ¶ 129.

Months later, the GE Plaintiffs and Citibank settled their dispute. Under the terms of the Settlement Agreement, the GE Plaintiffs and Citibank aimed "to settle, compromise, resolve amicably and discontinue . . . their dispute under [the Purchase and Sale Agreement] arising out of, relating to or in connection with" the allegedly fraudulent transfers and ongoing lawsuit involving Worthington. Settlement Agreement at ¶ G ("Recitals"). They further agreed to a mutual release from all liability under the Purchase and Sale Agreement or relating to the fraudulent transfers at issue in the lawsuit. *Id.* at ¶¶ 2, 3. Under the Settlement Agreement, Citi paid the GE Plaintiffs an amount that exceeded $2.5 million, the total amount of the transfers to Worthington.

Meanwhile, the GE Plaintiffs' suit against Worthington proceeded toward trial. During a pretrial conference, the GE Plaintiffs and Worthington agreed to stipulate to the dates and amounts of every settlement related to the dispute. They further agreed that settlement-related issues would not go to the jury and would be addressed post-verdict to determine the availability of a settlement credit. Accordingly, in a pretrial order, the district court denied as moot the GE Plaintiffs' request to exclude all evidence, statements, or arguments regarding the GE Plaintiffs' settlements with third parties. In the same order, the district court reiterated its prior determination that an objective standard of the "good faith" defense applies and, over Worthington's objection, allowed the GE Plaintiffs to introduce evidence that Worthington "should have known" of the fraudulent nature of the transfers.[2]

---

[2] On the same basis that the "good faith" defense was an objective standard, the district court had earlier denied Worthington's motion for summary judgment that argued,

At trial, the parties disputed whether Worthington accepted the transfers from Wright & Wright in "good faith" under TUFTA.  The GE Plaintiffs' expert testified that Worthington's loan review process deviated from industry standards and that the bank knew of facts that put it on notice that the transfers were likely fraudulent.  The district court instructed the jury as follows:

> To establish that it acted in good faith, Worthington must prove by a preponderance of the evidence that it lacked actual and constructive knowledge of the debtor's fraud.  Actual knowledge is what one actually knows, and constructive knowledge means facts or circumstances that excite the suspicions of a person of ordinary prudence under the same or similar circumstances and put him on inquiry of the fraudulent transfer.  Stated another way, you may not find that Worthington acted in good faith if the evidence shows that it had actual or constructive knowledge of a fraudulent transfer.

The jury ultimately found that the GE Plaintiffs had proven by a preponderance of the evidence that Wright & Wright transferred the $2.5 million to Worthington with the intent to hinder, delay, or defraud GE Capital, and that Worthington failed to prove that it accepted the transfers in good faith.[3]

Following the verdict, the district court ordered the GE Plaintiffs to provide Worthington with copies of all relevant settlement agreements. Subsequently, the GE Plaintiffs disclosed the Settlement Agreement.

---

among other things, that the GE Plaintiffs could not overcome Worthington's evidence of its subjective good faith.

[3] Additionally, the jury found that Worthington failed to prove that the GE Plaintiffs' conduct in connection with the transfers was unconscientious, unjust, or inequitable; that Worthington was seriously harmed by the GE Plaintiffs' conduct; that it was entitled to the defense of equitable estoppel; or that its own conduct was not unconscientious, unjust, or inequitable.

No. 13-10171

Worthington then moved for a mistrial and requested a settlement credit on the grounds that the settlement proceeds received from Citibank exceeded the amount of the judgment. The district court denied Worthington's requests and voided the three transfers.[4] This appeal followed.

## II

We review a district court's conclusions of law concerning the calculation of a settlement credit *de novo*. *See Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245 (5th Cir. 1994). Likewise, when "a jury instruction hinges on a question of statutory construction, this court's review is *de novo*." *United States v. Garcia-Gonzales*, 714 F.3d 306, 312 (5th Cir. 2013) (citation omitted). We review a district court's evidentiary rulings for abuse of discretion. *United States v. Miller*, 520 F.3d 504, 510 (5th Cir. 2008). However, "[a] trial court abuses its discretion when its ruling is based on an erroneous view of the law," *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003), and our review of legal conclusions is plenary, *Johnston & Johnston v. Conseco Life Ins. Co.*, 732 F.3d 555, 562 (5th Cir. 2013).

## III

Worthington's first claim is that the district court erred as a matter of law in entering its post-verdict judgment by failing to apply a settlement credit for the GE Plaintiffs' settlement proceeds received from Citibank. Worthington contends that it is entitled to such credit for two reasons: First, TUFTA limits recovery to "the amount necessary to satisfy the creditor's claim," and second, Texas's common-law one-satisfaction rule permits only one recovery for a single injury. Below, we consider each in turn.

---

[4] Worthington does not appeal the denial of its motion for mistrial.

**A**

Worthington first submits that the plain text of TUFTA mandates that a settlement credit offset the judgment.

The Texas Uniform Fraudulent Transfer Act ("TUFTA") aims to prevent debtors from fraudulently placing assets beyond the reach of creditors. *Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W.3d 290, 293 (Tex. App.—Dallas 2013). TUFTA provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ." Tex. Bus. & Comm. Code § 24.005(a)(1). "A fraudulent transfer under [TUFTA] is a tort," *Challenger*, 402 S.W.3d at 295, and the defrauded creditor "may obtain . . . avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim," Tex. Bus. & Comm. Code § 24.008(a)(1).

Section 24.009(b) provides that to the extent a transfer is voidable under § 24.008(a)(1), the creditor may "recover judgment for the value of the asset transferred . . . or *the amount necessary to satisfy the creditor's claim*, whichever is less." *Id.* § 24.009(b) (emphasis added). The statute defines "claim" as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). Such judgment may be entered against "the first transferee of the asset . . . ." *Id.* § 24.009(b)(1).

Under Worthington's reading of the § 24.009(b) recovery-limiting provision, because the settlement proceeds that the GE Plaintiffs received from Citibank exceeded the value of the fraudulent transfers at issue in the TUFTA action, the settlement "satisf[ied] the creditor's claim" in full. *Id.* § 24.009(b).

That is, as the "amount necessary to satisfy the creditor's claim" is zero, the GE Plaintiffs cannot recover anything from Worthington.  *Id.*

To support its reading of § 24.009(b), Worthington contends that the GE Plaintiffs' two claims—their contractual claim against Citibank and their TUFTA claim against Worthington—are actually one single "claim." Worthington points first to factual commonalities; both claims implicate the same three fraudulent transfers.  Second, Worthington submits that TUFTA defines "claim" broadly as "a right to payment or property . . . ." Tex. Bus. & Comm. Code § 24.002(3).  Accordingly, by Worthington's logic, the fact that one claim sounds in contract and the other in tort does not give rise to two separate "claims" for the purposes of § 24.009(b).  Rather, both actions asserted an identical "right" to the same "payment or property"—*i.e.*, the fraudulently transferred $2.5 million—and, therefore, the settlement proceeds from Citibank satisfy the GE Plaintiffs' avoidance "claim" against Worthington.

The Texas Supreme Court has not considered whether "claim" in § 24.009(b) encompasses a separate legal right arising not from TUFTA, but from the same underlying factual injury.  Thus, because the law is not fully clear, we must decide how the Texas Supreme Court would resolve the issue.

"In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *See Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (citation and internal quotations marks omitted).  We are mindful that "our task is to attempt to predict state law, not to create or modify it." *Id.* (citation, alteration, and internal quotation marks omitted).  "While the decisions of the intermediate Texas courts of appeals provide guidance, they do not necessarily bind us." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857–58 (5th Cir. 2010).  "If the Supreme Court of Texas has not ruled on an issue before us, we must

No. 13-10171

determine, to the best of our ability, what it would decide under the same circumstances." *Id.* at 858.

We predict that the Texas Supreme Court would conclude that the term "claim" cannot withstand such an expansive interpretation. We look first to the statute's text. While TUFTA defines a "claim" to include any "right to payment or property," Tex. Bus. & Comm. Code § 24.002(3), nowhere does the statute reduce multiple rights arising from distinct legal theories to a single "claim," even where such rights arise from the same facts. Furthermore, "claim" must be read in the context of the specific "action" mentioned earlier in the same provision—an action to void a transfer under § 24.008(a)(1). Tex. Bus. & Comm. Code § 24.009(b). That is, "the amount necessary to satisfy the creditor's claim," *id.*, means strictly the amount necessary to satisfy the creditor's *avoidance* claim. Under Worthington's reading, notwithstanding the specific avoidance "action" referenced earlier in the provision, the word "claim" at the end of the very same provision would take on a much broader meaning and encompass other types of actions remedying the same factual loss—such as the GE Plaintiffs' contractual claim against Citibank. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 19 (Tex. 2007) ("In determining [a statute's] meaning, we must . . . consider the statute as a whole and construe it in a manner which harmonizes all of its various provisions.").

Additionally, at least one Texas court of appeals has interpreted "claim" under § 24.009(b) to exclude claims for damages beyond the value of the fraudulently transferred asset. In *Citizens National Bank of Texas v. NXS Construction, Inc.*, 387 S.W.3d 74 (Tex. Ct. App.—Houston [14th Dist.] 2012), after NXS sued Westex Communications on a defaulted promissory note, Westex's president transferred company assets without informing NXS. NXS then sued the asset transferees under TUFTA. *Id.* at 78–79. After the trial court entered judgment for NXS on its TUFTA claim, the parties disputed on

9

appeal whether attorneys' fees, court costs, and post-judgment interest were encompassed within the amount of NXS's "claim" under § 24.009(b). The court of appeals held that recovery of attorneys' fees, in addition to the amount of the note, was permitted under § 24.009 because the fees were bargained-for contractual damages under the terms of note itself, whose payment the fraudulent transfers aimed to avoid. *Id.* at 89–91. By contrast, the court determined that "claim" as defined in § 24.002(3) could not encompass court costs and post-judgment interest on attorneys' fees, which were merely "incidental expense[s] associated with the creditor's underlying 'right to payment.'" *Id.* at 91. *NXS* thus teaches that the "creditor's underlying 'right to payment'" in the avoidance action circumscribes the term "claim" in § 24.009(b). *Id.*

Here, the GE Plaintiffs' "right to payment" against Worthington under TUFTA does not encompass its contractual rights against Citibank under the Purchase and Sale Agreement. Unlike the attorneys' fees in *NXS*, which were provided under the promissory note for which the debtor and creditor had specifically bargained, here, the debtor Wright & Wright had no obligations to the creditor CitiCapital (now GE Capital) under the Purchase and Sale Agreement. Thus, any right that the GE Plaintiffs had under the Agreement are "incidental" to the GE Plaintiffs' right against Worthington under TUFTA. *Id.* Put differently, Worthington's liability for receiving fraudulent transfers cannot, as a matter of law, include Citibank's liability under the Purchase and Sale Agreement. Accordingly, the funds the GE Plaintiffs received from Citibank in satisfaction of their contractual claim cannot count toward the satisfaction of their TUFTA claim under § 24.009(b).

The text of TUFTA, standing alone, does not support Worthington's position that the GE Plaintiffs' "claim" has already been satisfied by the settlement, because the "claim" at issue here is an avoidance action arising

No. 13-10171

under TUFTA, distinct from the contractual claim that precipitated the settlement.

**B**

Worthington also claims that, alternatively, the one-satisfaction rule entitles it to a settlement credit for the proceeds the GE Plaintiffs received from Citibank, because the settlement ended a contractual dispute arising in part from the fraudulent transfers at issue in the TUFTA action.

Texas's one-satisfaction rule provides that "a plaintiff is entitled to only one recovery for any damages suffered." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000). The rule applies when "multiple defendants commit the same act as well as when defendants commit technically different acts that result in a single injury." *Id.* Under the rule, "the nonsettling defendant may only claim a credit based on the damages for which all tortfeasors are jointly liable." *Id.* at 391. This common-law doctrine evolved from Texas courts' application of the state's original contribution statute, which "address[ed] liability between tortfeasors" but not "the implications of a partial settlement on contribution." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 5 (Tex. 1992); *see also* Tex. Civ. Prac. & Rem. Code § 32.001 *et seq.* (1986) (contribution statute).[5] The policy behind the one-satisfaction rule is to

---

[5] The original contribution statute was one of four contribution schemes addressed by the Supreme Court of Texas in *Sterling*; the others are former Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.* (1986) (the comparative negligence statute), Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.* (2013) (the comparative responsibility statute), and common-law contribution by comparative causation under *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 429 (Tex. 1984). *See also* Ray C. Brooks, *Addendum: Applicability of the Four Schemes*, *in A Proposed Change to Texas Contribution and Partial Settlements Laws*, 24 Tex. Tech. L. Rev. 891, 917–920 (1993). When the comparative responsibility statute took effect on September 2, 1987, it displaced the comparative negligence statute and the *Duncan* doctrine for cases involving pure negligence, strict liability, and breach of warranty, but those prior rules applied to cases filed before the statute's effective date. *See Sterling*, 822 S.W.2d at 5; *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 & n.5 (Tex. 1993). Thus, for claims filed after 1987, the two remaining operative contribution schemes are the original contribution statute, Tex. Civ.

No. 13-10171

prevent a plaintiff from "receiv[ing] a windfall" where "a settling defendant has already partially contributed" to his recovery. *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993).

**1**

The Texas Supreme Court has not considered the applicability of the one-satisfaction rule where a tortfeasor seeks a settlement credit based on the settlement of a contractual dispute with a non-defendant third party involving the same underlying factual injury. Again, we are faced with an *Erie* guess.[6]

The Texas Supreme Court's one-satisfaction rule jurisprudence illuminates two contours of the doctrine relevant to this case. First, the one-satisfaction rule derives from tort law principles of contribution. The Court first articulated the one-satisfaction rule in *Bradshaw v. Baylor University*, 84 S.W.2d 703 (Tex. 1935), a tort case arising from a collision between a train and Baylor University's bus.[7] At trial, the bus-passenger plaintiff sued Baylor,

---

Prac. & Rem. Code § 32.001 *et seq.* (1986), as developed by common law doctrines such as the one-satisfaction rule, and the comparative responsibility statute, *id.* § 33.001 *et seq* (2013), for actions in pure negligence, strict liability, and breach of warranty, *Garrett*, 860 S.W.2d at 78 & n.5.

[6] In *RSR*, we declined to decide a related, but distinct, question of whether Texas's one-satisfaction rule precludes multiple recoveries for the same injury under different insurance contracts. *See RSR Corp.*, 612 F.3d at 857. In that case, the insured party RSR had settled with other insurers after initially suing them for payment under various insurance contracts. Later, it sought to recover from the non-settling insurer International additional amounts allegedly remaining to be paid under their contract. *Id.* at 855–57. We declined to consider whether RSR's recovery from International was barred by the one-satisfaction rule and instead affirmed the district court on the alternate grounds that the "other insurance" provision in the International insurance contract precluded additional recovery. *Id.* Like this case, the issue we reserved in *RSR* involves the applicability of the one-satisfaction rule beyond the domain of tort law. *Id.* But in contrast, in *RSR*, the allegedly overlapping recoveries all sounded in contract, and the settling and non-settling parties shared the alleged same contractual liability. Here, one claim sounds in contract and the other in tort, and the settling party (Citibank) and non-settling party (Worthington) do not share a common theory of legal liability.

[7] Because the Texas Supreme Court subsequently adopted this decision of the Commission of Appeals of Texas, we will discuss *Bradshaw* as a decision of the Supreme Court.

which then impleaded the train operator, alleging among other claims that it was due contribution from the operator. The plaintiff prevailed and recovered from Baylor $6,500, but he had settled with the train operator for the same amount prior to suing Baylor. *Id.* at 703–705. The *Bradshaw* Court affirmed a take-nothing judgment for the plaintiff, explaining that the one-satisfaction rule applies where "more than one wrongdoer contributed" to an injury. *Id.* at 705.

Second, the Court has applied the one-satisfaction rule to limit recovery only where the settling and non-settling parties share common liability. In *Sterling*, the Court emphasized that the damages all arose from the "alleged misrepresentations of all of the defendants" and that the plaintiff "himself alleged [that the defendants] were *joint* tortfeasors . . . ." *Sterling*, 822 S.W.2d at 8. Most recently, the Court again explained that under the one-satisfaction rule, "the nonsettling defendant may only claim a credit based on the damages for which all tortfeasors are *jointly liable.*" *Casteel*, 22 S.W.3d at 391 (emphasis added). "[S]eparate or punitive damages paid by the settling defendant" on his own behalf cannot offset a judgment against a non-settling defendant, since such amounts would not constitute "common damages." *Id.* at 391–92.

We also find guidance in *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675 (Tex. Ct. App.—Austin 2005), a decision of the Austin Court of Appeals. In that case, K & O contracted with the general contractor CTTI for the construction of an office and warehouse, and separately contracted with Garwood Architects for design services. After K & O concluded that faulty design and construction had caused cracks in the completed structure's concrete foundation, it sued CTTI and Garwood, but settled its negligence claims against Garwood before the case was submitted to the jury. The jury found that CTTI had breached the construction contract and that Garwood was negligent, and awarded damages against both defendants. The trial court

denied CTTI's request for a settlement credit on the basis of the Garwood settlement. *Id.* at 678–80.

The Austin Court of Appeals affirmed, reasoning that the one-satisfaction rule had no application outside of tort claims under the Texas Supreme Court decisions in *Sterling*, *Garrett*, and *Casteel*. The court first emphasized that under these precedents, the one-satisfaction rule "applies only to tort claims, not to breach of contract claims." *See id.* at 684. The court further explained that the *Casteel* Court's use of the terms "joint and several damages" would preclude application of the rule to a case involving contractual claims against a non-settling defendant and tort claims against a settling defendant, given that requirements for establishing joint liability are distinct in contract and in tort.[8] Applying these principles, the court reasoned that CTTI's promises to deliver a defect-free building were unique to its contract with K & O. Because Garwood did not make such promises and was liable "only for its own negligence," CTTI could not enjoy a settlement credit based on the settlement proceeds that K & O received from Garwood. *Id.* at 685.[9]

---

[8] Joint liability in tort requires shared causation, though percentages of responsibility can vary, while joint liability in contract requires "what amounts to joint promises." *CTTI*, 164 S.W.3d at 684. The *CTTI* court further explained that applying the one-satisfaction rule in that case would be akin to "hold[ing] a person not a party to a contract liable for the breach of that contract." *Id.* at 685.

[9] We do not find persuasive the Austin court of appeals decisions cited by Worthington for the proposition that the one-satisfaction rule applies beyond tort claims. In those cases, the court explained in passing that the one-satisfaction rule's applicability is "not limited to tort claims." *Galle, Inc. v. Pool*, 262 S.W.3d 564, 573 (Tex. App.—Austin 2008); *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 75 (Tex. App.—Austin 2008). But neither case involved defendants that lacked common alleged tort liability, as we confront here. *See RSR Corp. v. Int'l Ins. Co.*, 2009 WL 927527, at *12–13 (N.D. Tex. 2009) (unpublished) (reviewing *Galle* and *Osborne*), *aff'd on other grounds* 612 F.3d 851 (5th Cir. 2010).

Moreover, we doubt that the Texas Supreme Court would adopt the sweeping principle that the one-satisfaction rule is "not limited to tort claims" and apply it in this case. In *Galle* and *Osborne*, the Austin court of appeals derived this observation from a Texas Supreme Court case involving alter ego liability for usury. In *El Paso Natural Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993), the Supreme Court held that in the context of a usury action, the one-satisfaction rule barred a plaintiff's additional recovery from a non-

No. 13-10171

Worthington claims that the Texas Supreme Court's opinion in *Garrett* expanded the one-satisfaction rule beyond the domain of tort, but it misunderstands this case.

In *Garrett*, the plaintiffs contracted to buy a plot of land, with plans to convert it into an automobile salvage yard. The sellers had acquired the land subject to a restrictive covenant prohibiting such usage, but never informed the plaintiffs. Subsequently, a title company failed to discover the covenant during its title search, and a second title company issued a title commitment representing that no restrictive covenants existed. Later, having begun converting the land into a salvage yard, the plaintiffs were told of the restriction. They sued the sellers alleging misrepresentations and settled for $69,000, and then separately sued the title companies for negligence and breach of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Comm. Code §§ 17.41–.63. The trial court awarded the plaintiffs approximately $115,000, plus attorneys' fees. *Garrett*, 860 S.W.2d at 75–76. On motion for rehearing, the court of appeals held that the title companies were not entitled to a settlement credit because they had not "met their burden of establishing that [the sellers] were joint tortfeasors." *Id.* at 76.

The Texas Supreme Court reversed and remanded to the trial court. The Court provided an overview of the one-satisfaction rule, emphasizing that the

---

settling defendant, after the plaintiff had already settled with that defendant's alleged alter ego. The Court explained that the non-settling defendant's liability was purely "derivative," and that the two defendants were "jointly and severally liable" for damages assessed against the settling defendant.

Thus, while *El Paso* suggests that the one-satisfaction rule might apply beyond tort (though the Court did not consider whether a usury suit sounds in tort), the Court applied the one-satisfaction rule because it had concluded that the two defendants were jointly liable. That is, consistent with the Austin court of appeals' reasoning in *CTTI*, we understand *El Paso* to permit, at most, application of the one-satisfaction rule where defendants are jointly liable, even when their common liability is not based in tort. Here, however, Worthington and Citibank shared no common liability; thus, even under *El Paso*, the one-satisfaction rule is unavailable.

15

doctrine determines "the effects of a partial settlement on the contribution rights between joint tortfeasors" and applies where "a plaintiff files suit alleging that multiple tortfeasors are responsible for the plaintiff's injury" and receives a settlement therein. *Id.* at 78. The Court then concluded that here, the settlement agreement between the plaintiffs and the sellers arose from "claims based on 'alleged misrepresentations made by [the sellers].'" *Id.* at 79. "Although not adjudicated to be joint tortfeasors," the Court reasoned, "the title companies and the sellers cannot reasonably be said to have caused separate injuries." *Id.* Because both suits "compensate an indivisible injury," the Court concluded that the title companies should receive a settlement credit. *Id.*

While the Court's observation that the title companies and sellers were "not adjudicated to be joint tortfeasors" might suggest that the one-satisfaction rule extends to settlements received in connection with non-tort actions, we reject such an interpretation. Rather, *Garrett* must be read together with *Bradshaw* and *Sterling*, whose formulation of the one-satisfaction rule the *Garrett* Court expressly "reaffirm[ed]." *Id.*

A principle common to *Bradshaw*, *Sterling*, and *Garrett* is that for purposes of applying the one-satisfaction rule, a settling party's status as joint tortfeasor need not be proven by evidence, so long as there is an *allegation* to this effect. In *Bradshaw*, the Court deemed the train operator as a joint tortfeasor where Baylor alleged this in its cross-claim, *Bradshaw*, 84 S.W.2d at 704, and in *Sterling*, the plaintiff had "alleged [that the defendants] were *joint* tortfeasors," *Sterling*, 822 S.W.2d at 8. Likewise, in *Garrett*, the Court explained that the one-satisfaction rule applies only when "a plaintiff files suit *alleging* that multiple tortfeasors are responsible for the plaintiff's injury" and

subsequently receives a settlement. *Garrett*, 860 S.W.2d at 78 (emphasis added).[10]

In sum, the one-satisfaction rule emerges in Texas Supreme Court jurisprudence as a tort law contribution doctrine, and its application has generally been limited to cases in which a plaintiff settles with an alleged joint tortfeasor.

**2**

Applying the above principles, we predict that the Texas Supreme Court would conclude that the one-satisfaction rule is inapplicable here and would not entitle Worthington to a settlement credit.

Here, the GE Plaintiffs have never alleged that Citibank was a joint tortfeasor alongside Worthington.[11] *Garrett*, 860 S.W.2d at 78; *Sterling*, 822 S.W.2d at 8. Nor did Worthington ever file a cross-claim against Citibank seeking contribution under a theory that Citibank was a joint tortfeasor. *See Bradshaw*, 84 S.W.2d at 704.[12] In the absence of any such allegation, we must conclude that Worthington and Citibank did not "commit the same act" or "commit technically different acts that result in a single injury." *Casteel*, 22

---

[10] Indeed, if allegations alone could not establish joint tortfeasor status, then the one-satisfaction rule would be dramatically narrowed; only settlements received from parties actually adjudicated to be tortfeasors could offset judgments against non-settling parties.

[11] For instance, a negligence action would require a finding that Citibank, as the parent company of CitiCapital at the relevant time, caused the fraudulent transfers. Even less conceivable is Citibank's liability for an intentional tort. In short, Worthington has not alleged, nor does the record show, that Citibank would be liable in tort.

[12] In its reply brief, Worthington suggests that the GE Plaintiffs' action is actually a claim for "contribution" on behalf of Citibank. There is no authority cited for the proposition that a defendant in tort and non-party to a contract could be liable under that contract under a "contribution" theory. *Cf. CTTI*, 164 S.W.3d at 684 (distinguishing between tort and contractual theories of joint liability). This theory aside, if Worthington and Citibank were indeed "potentially liable for the same injury," as Worthington asserts, and if *Worthington* seeks "contribution" from Citibank, claiming that the latter is a joint tortfeasor, then there should have been allegations to this effect in the district court. We reject Worthington's tardy attempt on appeal to deem Citibank a joint tortfeasor, in the absence of any allegations below.

No. 13-10171

S.W.3d at 390. By the same logic, Worthington cannot be joined to Citibank's alleged violations of the Purchase and Sale Agreement, as it was not a party to that contract and no such contractual claim was ever advanced. *CTTI*, 164 S.W.3d at 685.

Thus, as a matter of law, there is no "indivisible injury" to which the one-satisfaction rule would apply. *Garrett*, 860 S.W.2d at 79.

## C

Citibank's alleged contractual breach and the TUFTA action against Worthington may share common underlying facts—the three fraudulent transfers from CitiCapital to Worthington totaling $2.5 million, induced by Wright & Wright. But such factual commonality does not suffice to count the contractual dispute's settlement against TUFTA's limit on recovery for a single avoidance "claim," Tex. Bus. & Comm. Code § 24.009(b), or to render Citibank a joint tortfeasor for one-satisfaction rule purposes,[13] *Casteel*, 22 S.W.3d at 390; *Garrett*, 860 S.W.2d at 78. Accordingly, the district court did not err in denying Worthington a settlement credit for the settlement proceeds that the GE Plaintiffs received from Citibank.[14]

---

[13] The fact that the outcomes under both TUFTA's recovery-limiting provision and the one-satisfaction rule are identical is supported by Worthington's own contention that the two are "entirely consistent."

[14] Because we have concluded that neither TUFTA's § 24.009(b) nor the one-satisfaction rule entitles Worthington to a settlement credit, we need not address the GE Plaintiffs' submission that a credit is barred by the collateral source rule, which "precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else—a collateral source." *Haygood v. De Escabedo,* 356 S.W.3d 390, 394–95 (Tex. 2011). Likewise, we do not consider Worthington's contention that the district misapplied the settlement credit burden-shifting framework, because, as a non-settling defendant not privy to settlement negotiations, it failed to meet its initial burden of showing that "the plaintiff settled with another party the claim on which the nonsettling defendant is liable." *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1340 (5th Cir. 1995) (internal quotations omitted). As discussed above, the GE Plaintiffs never alleged that Citibank was liable in tort or under TUFTA, and thus there is no "claim on which [Worthington] is liable" that is also common to Worthington and Citibank. *Id.*

18

No. 13-10171

## IV

Worthington next submits that the district court erred as a matter of law in interpreting TUFTA's good faith defense as an objective standard. This error, Worthington claims, infected both the district court's evidentiary ruling allowing testimony that Worthington should have detected the fraud, and its jury instructions explaining that Worthington's constructive knowledge of fraud would defeat a good faith defense.

Under TUFTA, "[a] transfer or obligation is not voidable under Section 24.005(a)(1) . . . against a person who took in good faith and for a reasonably equivalent value . . . ." Tex. Bus. & Comm. Code § 24.009(a).[15] Worthington contends that to avail itself of TUFTA's "good faith" defense, it had to prove only that it lacked subjective knowledge of the transferor's "secret agreement" to defraud another creditor under *Hawes v. Cent. Tex. Prod. Credit Ass'n*, 503 S.W.2d 234, 235–36 (Tex. 1973). In response, the GE Plaintiffs maintain that *Hawes* was superseded by TUFTA and that this case should be controlled by the objective "good faith" test articulated in *Hahn v. Love*, 321 S.W.3d 517 (Tex. App.—Houston [1st Dist.] 2009).

## A

As a preliminary matter, we need not decide today whether *Hawes* survived TUFTA's enactment. Even if it did, the district court correctly recognized that that case deals only with preferential transfers, which are not implicated here.

In *Hawes*, the Supreme Court of Texas articulated a "good faith" exception to TUFTA's predecessor statute in the case of "preferences," where a debtor conveys property to one creditor, with preference over another. In that

---

[15] The parties stipulated that Worthington took the transfers for reasonably equivalent value. *See* Tex. Bus. & Comm. Code § 24.009(a).

No. 13-10171

case, Parker owed his son-in-law Hawes $1,900 and the Central Texas Production Credit Association $100,000. Parker conveyed land to Hawes in exchange for cancellation of his $1,900 debt, and the Association sued to set aside the conveyance, alleging fraud upon its rights as creditor. Hawes, in response, contended that he, too, was a creditor entitled to payment. *Hawes*, 503 S.W.2d at 234–35. The trial court voided Parker's conveyance to Hawes, and the court of appeals affirmed.

The Supreme Court of Texas affirmed the appeals court. The Court considered the predecessor statute to the TUFTA, which provided that "[t]he title of a purchaser for value is not void [as fraudulent] . . . unless he purchased with notice of . . . the intent of his transferor to delay, hinder, or defraud." *Id.* at 235 (citing former Tex. Bus. & Comm. Code § 24.02). The Court then explained a long-standing common-law exception to the statute in the case of "preferences"—"conveyances of property by an insolvent debtor to one of his unsecured creditors in payment of a debt." *Id.* The Court explained that such conveyance is "valid notwithstanding the statute, if the value of the property does not exceed the amount of the debt and the grantee creditor receives the conveyance in good faith, meaning without a secret agreement to benefit the grantor in some way other than by discharge of his debt." *Id.* at 235–36. So long as these two requirements are met, the conveyance is valid even if the "grantee had notice of [the grantor's] intent [to favor one of his creditors]." *Id.* at 236. But despite this good-faith exception in the case of a debtor's "preference," the Court concluded that the conveyance was properly voided because the evidence supported a finding that Hawes did *not* act in good faith.[16]

---

[16] Under Rule 279 of the Texas Rules of Civil Procedure, in the absence of written findings on a necessary element of a claim or defense, an appeals court can deem the element to have been established by the trial court if there is evidence to support the finding. *Hawes*, 503 S.W.2d at 236.

20

No. 13-10171

Worthington contends that even if *Hawes* governs only preferential transfers, Wright & Wright's transfers to Worthington constitute "preferences" because Worthington and GE Capital were both Wright & Wright's creditors. But Worthington and GE Capital were not creditors concurrently; GE Capital became a creditor only after Wright & Wright allegedly appropriated its funds to execute the fraudulent transfers to Worthington. Thus, Wright & Wright did not give *preferential* treatment to debt owed to Worthington, over debt owed to GE Capital.[17]  Rather, it fraudulently used GE Capital's (previously CitiCapital's) funds to repay its debt to Worthington, whereupon GE Capital became a new creditor.

In sum, because this action does not concern a preferential transfer, even if *Hawes* is still good law, it is inapplicable here.[18]

## B

Because *Hawes* is inapposite, and because no opinions of the Texas Supreme Court have applied TUFTA's "good faith" defense, we must look to the lower state courts and other persuasive authorities to predict how the Supreme Court would define TUFTA's "good faith" standard. *See Temple*, 720 F.3d at 307; *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th

---

[17] Worthington also suggests that Wright & Wright preferred Worthington over PlainsCapital Bank, another creditor at the time of the transfers to Worthington. But even if these facts might support a preferential transfer action, PlainsCapital did not actually bring such an action (as the creditor who was not preferred). Rather, the claim at issue is the GE Plaintiffs' avoidance action, not a preferential transfer action.

[18] We observe that TUFTA's preferential transfer provision seems rather difficult to reconcile with *Hawes*. *See* Tex. Bus. & Comm. Code § 24.006(b) ("A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had *reasonable cause to believe that the debtor was insolvent*." (emphasis added)). This statutory language, coupled with the legislative history cited by the GE Plaintiffs, suggests that *Hawes* might have been superseded by TUFTA. *See* House Research Organization Bill Analysis, HB 2193 (May 13, 1987) ("CSHB 2193 would replace current fraudulent-transfer law with the Uniform Fraudulent Transfer Act (UFTA)."). But we decline to decide this question today.

21

No. 13-10171

Cir. 2008) ("In making the *Erie* guess, we may consider, among other sources, treatises, decisions from other jurisdictions, and the 'majority rule.'").

Worthington cites two decisions of Texas courts of appeals that applied *Hawes*'s subjective test outside of a "preference" context—*Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc.*, 159 S.W.3d 266 (Tex. App.—Dallas 2005, no pet.), and *Senior Commodity Co. v. Econo-Rail Corp.*, 2000 WL 350508 (Tex. App.—Houston [14th Dist.] 2000) (unpublished). However, both *Yokogawa* and *Senior Commodity* apply *Hawes* in rather conclusory fashion. *Yokogawa*, 159 S.W.3d at 270–71; *Senior Commodity*, 2000 WL 350508, at *8. And since we have already determined that *Hawes* does not govern this case, we predict that the Texas Supreme Court would likewise not be persuaded by *Yokogawa* and *Senior Commodity* in deciding this case.[19]

The GE Plaintiffs, in response, contend that this case is controlled by the objective "good faith" standard of *Hahn*. In that case, a judgment debtor sold a property to an entity allegedly owned and operated by the debtor's family, and the entity subsequently sold it to Love. Hahn, the judgment creditor, sought an execution sale of the property to satisfy the judgment. The entity sued Hahn, seeking an injunction prohibiting the execution sale. Love intervened and sought an injunction prohibiting the sale and removal of the cloud from his title, and Hahn filed counter-claims against Love. The trial court granted Love's motion for summary judgment on grounds that he was a good-faith purchaser of the property under § 24.009(a) of TUFTA. *Id.* at 520–23.

---

[19] Worthington cites other cases that undermine its reading of *Hawes*. Worthington cites the dissenting opinion in *Tigrett v. Pointer*, 580 S.W.2d 375 (Tex. App.—Dallas 1978, no pet.), but even the dissent recognized that *Hawes* applied to preferences. *Id.* at 396–97 (Akin, J., dissenting). Worthington also invokes *Bossier Bank & Trust Co. v. Phelan*, 615 S.W.2d 872 (Tex. App.—Houston [1st Dist.] 1981, no pet.). But Worthington omits from its discussion of that case the court's recognition that *Hawes* governs only "preference" cases. *Id.* at 874.

No. 13-10171

The court of appeals reversed, concluding that there were fact questions "both as to whether the transfer of the property to Love was fraudulent and as to Love's actual or constructive notice of facts and circumstances indicating the intent to defraud . . . ." *Id.* at 531. In reaching this conclusion, the court articulated an objective definition of "good faith," explaining that "[a] transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in good faith and is not a bona fide purchaser." *Id.* at 527. *Hahn* thus stands for the proposition that TUFTA's "good faith" defense requires an objective assessment of what the transferee "should have known," rather than a subjective inquiry into what he actually knew.

*Hahn*'s objective "good faith" standard finds support in the federal courts and in other states with similar statutes, to which we may look for persuasive authority in making our *Erie* guess. *See Temple*, 720 F.3d at 307; *SMI Owen Steel*, 520 F.3d at 437. We have previously understood TUFTA's "good faith" defense to represent an objective standard, though we have not yet considered the question squarely in a published opinion.[20] At least one bankruptcy court has interpreted the "good faith" defense similarly. *See Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009). Lastly, we as well as the Ninth Circuit have interpreted other states' uniform fraudulent transfer acts to follow the same objective "good faith" approach. *See, e.g.*, *Warfield v.*

---

[20] *See Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 439 (5th Cir. 2013) (applying objective "good faith" standard under § 24.009(b)(2) in affirming district court's grant of summary judgment to TUFTA plaintiff and reasoning that the defendant-transferees were "closely related to [the debtor-transferor] and they are familiar business partners; therefore, [the transferees] *would have been aware of* [the transferor's] financial predicament and maneuvering tactics" (emphasis added)); *Wren Alexander Invs. LLC v. I.R.S.*, 530 F. App'x 302, 306–307 (5th Cir. 2013) (unpublished) (citing *Hahn*).

*Byron*, 436 F.3d 551, 558–60 (5th Cir. 2006) (interpreting Washington's UFTA); *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535–36 (9th Cir. 1990) (interpreting Hawaii's UFTA).

Moreover, we conclude that the Texas Supreme Court would not welcome the practical consequences of adopting the subjective "secret agreement" standard of *Hawes*. Such a lenient standard would protect even those transferees who "look the other way" in questionable transactions; other jurisdictions allowing a subjective "good faith" defense still do not sanction such willful blindness. *See, e.g.*, *Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 487–93 (Bankr. S.D.N.Y. 2011) ("[T]he appropriate test for determining constructive knowledge, and hence 'good faith,' under DCL § 272 is the subjective 'conscious turning away' standard under which the defendant . . . is charged with the knowledge of what was obvious but ignored, or doubtful but not explored," *id.* at 491).[21] Worthington has identified no other jurisdiction that uses the "secret agreement" standard in an analogous statutory context, and we decline to guess that the Texas Supreme Court would wish its state to become the first.[22]

---

[21] We do not base our *Erie* guess on bankruptcy jurisprudence under Section 548 of the Bankruptcy Code, which establishes a transferee's good faith defense to the trustee's power to avoid a debtor's fraudulent transfers. 11 U.S.C. § 548(c). Certain authorities indicate that § 548 is not necessarily substantively congruent with state-law counterparts, despite a common ancestry. *See In re Dreier LLP,* 462 B.R. at 487–93 (distinguishing objective "good faith" test under § 548 from New York's Debtor & Creditor Law § 272); FRAUDULENT TRANSFERS, PREBANKRUPTCY PLANNING AND EXEMPTIONS § 4.14 n.11 (2014) (reviewing various "good faith" standards); COLLIER ON BANKRUPTCY § 5-548.01 ("Given the elemental nature of fraudulent transfer law, . . . there was no preemption intended [by codification of state fraudulent transfer laws in the Bankruptcy Code], and states (as well as the federal government) continued to adapt parts of fraudulent transfer law for their own purposes.").

[22] For the good faith defense to alleged preferential transfers, New York law has a "secret agreement" standard, but one that lacks the fraudulent import of *Hawes*. As the Second Circuit explained in *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005), in New York, preferential transfers are "neither fraudulent nor otherwise improper," notwithstanding "knowledge on the part of the

No. 13-10171

Because *Hahn* is the most thorough and well-reasoned Texas case applying TUFTA's "good faith" defense, and because its objective definition of "good faith" accords with numerous other persuasive authorities, we predict that the Supreme Court of Texas would adopt *Hahn*'s approach if presented with the question. Accordingly, the district court's jury instructions and evidentiary ruling, premised on this objective standard, were not erroneous.

## V

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement *to that effect*." *Id.* at 54–55 (emphasis added) (citation omitted). Thus, the "secret agreement" of *Sharp* is only an agreement to give preferential treatment, not to defraud the other creditor. By contrast, under *Hawes*, a "secret agreement to benefit the grantor in some way other than by discharge of his debt" implies that the agreement implicates some improper benefit (e.g. the shielding of assets from the other creditor). This difference is borne out by the *Sharp* court's subsequent conclusion that the "secret agreement" standard is consistent with the rule that "the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual *or constructive* knowledge of any fraudulent scheme." *Id.* at 55 (emphasis added) (citation omitted).

25